UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| TYRRELL B.,[1]<br>   Plaintiff,<br>  v.<br>KILOLO KIJAKAZI, et al.,<br>   Defendants. | Case No. 23-cv-05512-RMI<br><br>**ORDER ON SOCIAL SECURITY APPEAL**<br>Re: Dkt. Nos. 14, 18 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision finding that Plaintiff's disability had ceased under Title II of the Social Security Act. *See* Admin. Rec. at 1.[2] The Appeals Council of the Social Security Administration declined to review the ALJ's decision. *Id.* As such, the ALJ's decision is a "final decision" of the Commissioner of Social Security, appropriately reviewable by this court. *See* 42 U.S.C. § 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (Dkts. 8, 10) and both parties have filed briefs (Dkts. 14, 18).[3] For the reasons stated below, Defendant's motion for summary judgment is DENIED, and the case is REMANDED to the ALJ for further proceedings consistent with this order.

**I. Background**

Plaintiff was raised in foster care, where he suffered physical, emotional, and sexual abuse.

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR"), which is independently paginated, has been filed in ten attachments to Docket Entry #13. *See* Dkts. 13-1 through 13-10.

[3] Defendant's brief is styled as a "Cross Motion for Summary Judgment."

AR at 68.  This past trauma still causes Plaintiff "nightmares and flashbacks[.]"  *Id.* at 813.  Plaintiff took special education classes in school and described himself as a "slow learner[.]"  *Id.* at 68.[4]

Plaintiff was incarcerated for much of the relevant time period.  *See* AR at 68 (November 2018 arrest for residential burglary), *id.* at 69 (July 2019 arrest for second-degree burglary).  As a result, the medical evidence consists almost entirely of treatment notes from jail and prison medical service providers.  Some of those notes reflect earlier medical records that are not part of the record before the court.  One treatment provider summarized them as follows: "[B]etween 2009 and 2016 there are multiple [ER] visits that lead to inpatient admissions for fatigue, and shortness of breath and bilateral extremity edema."  (716-17).

Plaintiff is morbidly obese and suffers from edema in his lower extremities.  AR at 82, 588, 715.  The edema appears to be linked to Plaintiff's obesity, as it worsened when Plaintiff gained weight, improved "as a result of" Plaintiff's weight loss, and is not cardiac in nature.  *Id.* at 82, 715.  Indeed, at least one treatment provider classified Plaintiff's edema as "obesity chronic dependent edema[,]" and another characterized the edema as "due to adiposity[.]"[5]  *Id.* at 717, 778.  Plaintiff was prescribed a compression stocking and a wedge to use at night to elevate his legs.  *Id.* at 778.  In 2018, Plaintiff reported that he could walk up to 50 yards at once.  AR at 339.  In 2022, Plaintiff reported suffering from chronic tendonitis in his left foot and stated that orthopedic shoes "have been helpful with his walking."  *Id.* at 1010.  Later that year, Plaintiff was noted to walk comfortably without the need for an assistive device.  *Id.* at 932, 994.

In December 2018, Plaintiff was hospitalized for several days with atypical chest pain, although ECG findings taken at that hospital visit were normal.  AR at 68, 397.  Hospital records

---

[4] The record is conflicted as to exactly how much education Plaintiff received.  Plaintiff describes himself as having "caught up" with his peers, and one evaluator reported that Plaintiff had completed a two-year degree.  AR at 68.  However, Plaintiff told another treatment provider that he "went to the 12th grade but did not graduate."  *Id.* at 1000.  In his testimony before the ALJ, Plaintiff stated that he attended community college but dropped out before the end of his first semester, and that he had not finished high school.  *Id.* at 50–51.

[5] "Adiposity refers to body fat[.]"  Harold E. Bays et al., *Obesity, Adiposity, and Dyslipidemia: A Consensus Statement from the National Lipid Association*, J. CLINICAL LIPIDOLOGY, Jul.–Aug. 2013, at 304.

2

reflect that Plaintiff had anemia, hypertension, type 2 diabetes, high cholesterol, and sleep apnea. *Id.* at 82. Plaintiff's cholesterol level was noted as "markedly abnormal" a month later. *Id.* at 731. While Plaintiff's cholesterol and blood sugar levels had improved by late 2021, the cholesterol levels were "still elevated" at that point. *Id.* at 1179, 1188. In early 2022, Plaintiff's blood pressure was noted as "fairly controlled" on his then-current medications. *Id.* at 1045. However, an ECG taken in May 2022 was "[a]bnormal", reflecting "Sinus rhythm with 1st degree A-V block" and an "Anterior T wave abnormality[.]" *Id.* at 948.

The record also indicates Plaintiff suffers from some form of sleep apnea. In 2014, a CPAP study was ordered for Plaintiff, although this study is not in the record. AR at 716. After his 2018 hospital visit, Plaintiff was discharged with a recommendation for CPAP. In 2019, he noted a need to elevate his head at night. *Id.* at 586. In 2022, he reported that he frequently woke up gasping and was tired throughout the day. *Id.* at 955. One mental health provider observed Plaintiff "breath[ing] heavily, audibly beneath mask" and was concerned enough to report this to Plaintiff's physician. *Id.* at 956, 1082. Plaintiff told the physician that he "has a history of sleep apnea and was on a CPAP machine and doing well during the day. When he came in to [sic] the Prison system, he did not get placed on the CPAP." *Id.* at 1030. He also told the physician that "he wakes up startled and misses events and appointments very often" and that he is sleepy "everyday [sic]." *Id.*, *id.* at 1044. "During the visit, [Plaintiff was] dosing [sic] off and looks very sleepy." *Id.* at 1044. The physician scheduled Plaintiff for a sleep study, noting that he "needs it promptly." *Id.* at 1030. The results of the sleep study are not in the record.

In addition to his physical ailments, Plaintiff alleges auditory hallucinations, which he describes as "like a waiting room in my head, a bunch of chatter[.]" AR at 68. While the voices are generally indistinct, he once reported "that the voices are telling him that many people are trying to hurt him," but that he did not believe them. *Id.* at 722. Plaintiff noted that "the sound in the pod magnifies the voices and the anxiety associated with the voices." *Id.* at 592. Plaintiff has taken several medications for these auditory hallucinations, with varying degrees of success. In late 2019, Plaintiff described the medication as helping his hallucinations "a little bit[.]" *Id.* at 839. In early September 2021, Plaintiff reported that "the medication stopped the noises[.]" *Id.* at

3

1426. Later that month, however, Plaintiff described the hallucinations and their impact on his life as "somewhat" severe. *Id.* at 1354. While Plaintiff associated his auditory hallucinations with methamphetamine use, treatment providers noted that Plaintiff had been using methamphetamine for some time before the hallucinations began. *Id.* at 1105. Additionally, Plaintiff continued to experience hallucinations while he was incarcerated and presumably lacked access to methamphetamine.

Plaintiff has also endorsed high levels of depression and anxiety over the years. *E.g.,* AR at 592 (Plaintiff "[r]eports ongoing anxiety – will go into his room and read to reduce his anxiety."), 727 (Plaintiff "still feels anxious, and sad" despite medication), 812 (anxiety 7 out of 10, depression 8 out of 10). One source of anxiety was "the noise around him" in the jail environment. *Id.* at 817. Plaintiff was described in one set of intake documents as "Paranoid about being in Jail[.]" *Id.* at 708. Plaintiff reported that "he gets paranoid (people are after him) when he does not take medications" and "tends to stay away from people" when his auditory hallucinations are bad. *Id.* at 817. Elsewhere, Plaintiff reported that "he has PTSD and anxiety from experiences in jail and prison, and feels anxious/on-edge, has to watch his back, and fears that someone will attack him. States this causes severe anxiety, and difficulty sleeping." *Id.* at 823. In late 2021, Plaintiff reported that his anxiety was "decreasing" and denied symptoms of depression. *Id.* at 1200, 1206. By early 2022, however, Plaintiff stated that his anxiety was not effectively managed by medication. *Id.* at 955. A few months later, Plaintiff noted that his anxiety medication initially "seemed to maybe be helping but then" Plaintiff heard that he might be transferred to a dorm setting and became "more stressed." *Id.* Plaintiff sent a health services request requesting to stop this transfer because "I told mental that dorm living ends up in violence for me[.]" *Id.* at 968.

Whether due to sleep apnea or anxiety, Plaintiff reported sleeping as few as three to four hours per night in mid-2019 and as little as two hours per night in early 2020. AR at 781, 817. In early September 2021, Plaintiff reported "sleeping 7–8 hours a night" and a "normal" energy level. *Id.* at 1427. Later in the month, however, he reported sleeping only five to six hours per night. *Id.* at 1357. He noted that his medications helped him sleep. *Id.* at 1225. By early 2022, he told care providers that he would "toss and turn" at night, did not sleep well in the prison environment, and

4

was tired throughout the day. *Id.* at 955. By May of that year, he reported "considerabl[e]" trouble falling asleep, staying asleep, or sleeping too much. *Id.* at 898.

The most notable aspect of Plaintiff's medical records, however, is the sheer number of times Plaintiff declined medical treatment. The record reflects the following events in Plaintiff's first year of incarceration alone:

- November 25, 2018: Plaintiff was arrested. AR at 68.
- December 1, 2018: Plaintiff refused to present for a blood-pressure check. *Id.* at 682.
- December 1–7, 2018: Plaintiff was a no-show for all of the twice-daily "pill calls" at which prisoners receive their medication. *Id.* at 492–94. Plaintiff's records reflect some additional missed pill calls prior to December 1, but do not give the dates. *Id.* at 491.
- December 3–5, 2018: Plaintiff refused to have his vital signs checked. *Id.* at 681–82.
- December 8, 2018: Plaintiff refused an evening nurse visit. *Id.* at 672.
- December 8–10, 2018: Plaintiff missed the morning pill calls. *Id.* at 494–95.
- December 9, 2018: Plaintiff refused a vital-sign check. *Id.* at 681.
- December 10, 2018: Treatment notes reflect that Plaintiff was not complying with any medications or with blood-pressure checks. *Id.* at 672.
- December 11, 2018: Plaintiff missed both pill calls. *Id.* at 495–96. When asked about his noncompliance during a sick call, Plaintiff "said he could not hear the pill call announcement and so [was] not coming for meds." *Id.* at 688.
- December 14, 2018: Plaintiff missed the morning pill call. *Id.* at 497.
- December 17, 2018: Plaintiff was a no-show for a behavioral health appointment. *Id.* at 810.
- December 27, 2018: Plaintiff missed the morning pill call. *Id.* at 507.
- January 1, 2019: Plaintiff missed the morning pill call. *Id.*
- January 3–4, 2019: Plaintiff refused a pill call on each of these days. *Id.* at 508–09.
- January 5, 10, and 21, 2019: Plaintiff missed one pill call on each of these days. *Id.* at 509–17.
- January 22, 2019: Plaintiff missed the morning pill call and refused the evening pill call. *Id.* at 517.

5

- January 23–24, 2019: Plaintiff missed the morning pill calls. *Id.* at 517–18.
- January 28, 2019: At a medical consultation, Plaintiff's elevated LDL cholesterol was attributed to the fact that Plaintiff "likely wasn't on meds[.]" *Id.* at 714.
- January 30, 2019: Plaintiff "refused to come out after he was called by the custody officer to take his court meds." *Id.* at 709.
- January 31, 2019: Plaintiff "refused all meds this morning. [A]gain offered this afternoon and still refused. [C]alled medical for an assessment[;] per an officer [Plaintiff] refused to come out." *Id.*
- February 6, 2019: Plaintiff "[r]efused lab works, meds and fsbg [blood sugar] test this am[.]" *Id.* at 742.
- February 7, 2019: Plaintiff "[r]efused blood draw. Stated, 'You guys missed the first time'." *Id.*
- February 8, 2019: Plaintiff "report[ed]—do not want labs now[.]" *Id.* at 743.
- February 9, 2019: Plaintiff requested a tooth examination and cleaning due to pain, but refused medication for the pain. *Id.* at 710–11. Plaintiff reported "irritability, said it is even hard [f]or him to come out of his room, doe[s n]ot want to socialize or mingle." *Id.* at 727. Plaintiff was warned that his prescriptions would expire if he did not attend medication management appointments. *Id.* at 731.
- March 4, 2019: Plaintiff was noted as "refus[ing] all meds[.]" *Id.* at 773. One of his prescriptions was discontinued as a result of the refusal. *Id.*
- April 20, 2019: Plaintiff "[v]erbally refused to come for BP check[.]" *Id.* at 679.
- April 21–24, 2019: Plaintiff missed all pill calls on these days. *Id.* at 518–19, 561. Plaintiff also missed blood sugar checks on the 22nd, 23rd, and 24th. *Id.* at 686–87. Notes reflect that Plaintiff refused his thyroid medication when a deputy offered it. *Id.* at 689.
- April 25, 2019: Plaintiff refused a blood sugar check. *Id.* at 686.
- July 14, 2019: Plaintiff was re-arrested after having been released in the interim. *Id.* at 69.
- July 15, 2019: Plaintiff was a "no show for the vitals check, refused to the deputy." *Id.* at 679.
- July 15–20, 2019: Plaintiff missed all pill calls. *Id.* at 602–03.

6

- July 16–19, 2019: Plaintiff either no-showed for blood testing or refused it on each of these days. *Id.* at 684–86.
- July 21–August 3, 2019: Plaintiff missed one or both pill calls on each of these days. *Id.* at 603–08.
- August 5, 2019: Plaintiff missed the morning pill call. *Id.* at 608.
- August 8–15, 2019: Plaintiff missed all of the morning pill calls. *Id.* at 608. Plaintiff did, however, request glasses on the 9th. *Id.* at 690.
- August 16, 2019: Plaintiff missed both pill calls. *Id.* at 611–612.
- August 19–20, 2019: Plaintiff missed the morning pill call. *Id.* at 612–13.
- August 22–September 4, 2019: Plaintiff missed all morning pill calls. *Id.* at 618–19. On September 4, Plaintiff refused medication from the deputy. *Id.* at 673.
- September 6–10, 2019: Plaintiff missed the morning pill calls. *Id.* at 618–19.
- September 11, 2019: Plaintiff was "seen in sick call re: non compliance with medications." Plaintiff "claim[ed] he missed his medications because he was asleep during pill call in the morning." *Id.* at 690–91.
- September 14 and 16, 2019: Plaintiff missed the morning pill calls. *Id.* at 620, 621.
- October 6, 2019: Plaintiff was a no-show for a blood sugar check. *Id.* at 682.
- October 7–8, 2019: Plaintiff refused the morning pill calls. *Id.* at 587.
- October 10, 2019: Plaintiff refused blood sugar monitoring. *Id.* at 684.
- October 10–18, 2019: Plaintiff missed the morning pill calls. *Id.* at 622–25.
- October 12, 2019: Plaintiff was a no-show for one blood-sugar check, but he accepted another later in the day. *Id.* at 683.
- October 13–14, 2019: Plaintiff refused blood sugar checks on both days.
- October 16, 2019: Plaintiff initially refused a blood sugar test, but was tested later in the day. *Id.* at 682.
- October 17, 2019: Plaintiff was noted at an appointment as "Non comply with meds." *Id.* at 448.
- October 18, 2019: Plaintiff was referred for a consultation "regarding Rx noncompliance." *Id.* at 625.

- October 20–November 1, 2019: Plaintiff missed the morning pill calls. *Id.* at 626–32.
- October 23, 2019: Plaintiff refused a psychiatric medication management appointment. *Id.* at 69.
- October 25, 2019: Plaintiff refused medication when offered by a deputy. *Id.* at 674.
- October 28, 2019: Plaintiff refused to attend a mental health appointment. *Id.* at 692, 827.
- October 29, 2019: Plaintiff refused another appointment. *Id.* at 828.
- November 4, 2019: Plaintiff requested an eye appointment. *Id.* at 674.
- November 8, 2019: Plaintiff missed two pill calls, but attended a later one. *Id.* at 635–36.
- November 9, 2019: Plaintiff missed all of the pill calls. *Id.* at 636.
- November 10–13, 2019: Plaintiff missed the morning pill calls. *Id.* at 637–38.
- November 12, 2019: Plaintiff missed a follow-up mental health appointment. *Id.* at 692. "[A]ccording to deputies, the patient refused to come to the clinic, and therefore he was not seen." *Id.* at 829–30. Because of Plaintiff's non-attendance at appointments, treatment providers were unable to monitor his response to the anti-psychotic drug Remeron; accordingly, Plaintiff's Remeron dosage was ordered to be tapered off. *Id.* at 830. A follow-up appointment was scheduled for December 9, with the notation that if Plaintiff missed that appointment, the facility "may consider not scheduling MD evaluations any longer." *Id.*
- November 15, 2019: Plaintiff missed the morning pill call. *Id.* at 639.
- November 17, 2019: Plaintiff refused his morning medications. *Id.* at 641.
- November 18, 2019: A clinical note stated that Plaintiff's medication could not be refilled unless he was seen on December 9. *Id.* at 692.
- November 19–20, 2019: Plaintiff missed all pill calls. *Id.* at 642.
- November 21, 2019: Plaintiff stated an intention to file a grievance due to the stoppage of his psychiatric medications. *Id.* at 69. When informed that the stoppage was because he had missed appointments, Plaintiff claimed that he was not properly notified of appointments and had not heard his name called over the loudspeaker due to noise. *Id.* at 832.
- November 22, 2019: Plaintiff missed both pill calls. *Id.* at 643.

8

- November 23–25, 2019: Plaintiff missed all morning pill calls. *Id.* at 643–44.
- November 25, 2019: Plaintiff was restarted on Remeron. *Id.* at 69.

Having already devoted four pages of this order to one year's worth of Plaintiff's treatment refusals, the court will spare the reader the finer details of the two-and-a-half years that followed except to say that they are in much the same vein.

In August of 2021, Plaintiff was confronted about his noncompliance with medication and stated: "I feel fine[,] I don't need it[.]" AR at 1350. After being counseled about the risks of missing medication, Plaintiff changed his mind, stating: "I want to take them, but only if they are KOP [given in Plaintiff's living area]. I don't want to got [sic] to pill call." *Id.* Plaintiff's medications were transferred to KOP in September of 2021. *Id.* at 1350. A month later, however, Plaintiff complained of "a hard time 'keeping track [of his medications] and telling which ones are which.' He has not been taking his KOPs due to his frustration." *Id.* at 1272.

Plaintiff's later treatment records give more insight into his reasons for treatment refusal. In December of 2021, Plaintiff refused laboratory testing with the comment "long line[.]" AR at 1171. In January of 2022, Plaintiff stated: "am refusing to take the medication because am stuck here[.]'" *Id.* at 1112. In May of that year, he refused an appointment because he had attended a separate appointment (with a separate treatment provider for a separate health concern) the previous day. *Id.* at 953. After refusing dialysis in June of 2022, Plaintiff "stated he does not want to have anything done, because he feels fine. He exercise[s] daily and has no problem voiding, and feels like there's nothing wrong with him . . . . [Plaintiff] states whatever is wrong with him started here in the prison, and he will be okay when he goes home." *Id.* at 853. Treatment providers noted that Plaintiff was "At Risk For Death [from] Refusal of Dialysis Treatment and blood pressure being high and abnormal lab values . . . [Plaintiff] denying to receive treatment." *Id.* at 855.

At one point, treatment providers attributed Plaintiff's elevated cholesterol levels to the fact that he "likely wasn't on meds" prior to being tested. AR at 714. Plaintiff also reported that "he gets paranoid (people are after him) when he does not take medications." *Id.* at 817. On mental status exams, Plaintiff's insight, judgment, and impulse control were frequently rated as only "fair" or "limited." *See* AR at 69, 82, 726, 731, 823, 1135.

9

## II. Procedural History

Plaintiff filed his original claim on December 10, 2019. AR at 65. He alleged disability from post-traumatic stress disorder (PTSD), anxiety, obesity, and congestive heart failure. *Id.*

On May 26, 2020, a state disability agency determined that Plaintiff's mental illnesses were severe, but that his hypertension and congestive heart failure were not. AR at 71. The agency determined that Plaintiff had mild limitations in understanding, remembering, and applying information and in adapting and managing himself. *Id.* The agency assessed moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace. *Id.* The agency found Plaintiff's statements only partially consistent with the medical record. *Id.* at 72. Ultimately, the agency concluded that Plaintiff was able to do "heavy/very heavy" work and was therefore not disabled. *Id.* at 75.

On June 22, 2020, Plaintiff filed for reconsideration. AR at 286. He claimed that his "daily activities have decreased" since his original application. *Id.* On reconsideration, the agency clarified that Plaintiff was "[l]imited to understanding and remembering simple instruction[,]" "[l]imited to performing simple, routine tasks[,]" and was moderately limited in his ability to accept instructions and respond appropriately to supervisors' criticism. *Id.* at 87. The agency found that Plaintiff was "limited to brief and superficial contact with co-workers and supervisors, no contact with the public." *Id.* at 88. Additionally, the agency found that Plaintiff could only cope with routine changes in the workplace setting and could not undertake fast-paced tasks with strict production quotas. *Id.* However, as Plaintiff had presented no new evidence on reconsideration, the agency rendered a decision based on the existing file, which the agency said showed Plaintiff was not disabled. *Id.* at 90.

Plaintiff's case was heard by an ALJ on July 1, 2022. At that hearing, Plaintiff explained that his mental illness had contributed to his history of weapons charges: "I think people are always trying to hurt me and it's the reason why I carry a weapon." AR at 43. He discussed his prior jobs as a security guard (which he quit due to an injury) and at a warehouse (which he quit because "[i]t just wasn't a good fit"). *Id.* at 45–46. He said that he had not worked for several years prior to his incarceration because "I think my anxiety, you know just being around people and whatnot is a deterrent to that." *Id.* at 44. He noted difficulties in being in large public spaces

10

or around large groups of people, stating that he "begin[s] to be almost paranoid, like something is going to happen." *Id.* at 48. He described his anxiety as "really bad. It feels like people are talking behind my back." *Id.* He stated that he dropped out of community college because "being on campus with . . . the crowds and being . . . in the classroom setting was upsetting to me." *Id.* at 51. Plaintiff went on to explain that his medication "curbs" his auditory hallucinations, but that they still occur. *Id.* at 48–49. He noted that the hallucinations affect his concentration and memory. *Id.* at 49. He stated that he has "difficulty remembering to keep appointments or getting to places on time" and that "I kind of depend on my support system around me to help" remember his appointments and schedule. *Id.* at 49–50.

On September 28, 2022, the ALJ denied Plaintiff's application for Social Security benefits. AR at 21. At Step 1 of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date. *Id.* At Step 2, the ALJ determined that Plaintiff "has the following severe impairments: anxiety-related disorders; history of substance-induced psychosis; substance use disorder (methamphetamine and cannabis)[.]" *Id.*

The ALJ discounted congestive heart failure and hypertension as severe impairments due to some normal heart and blood pressure readings throughout the years and Plaintiff's September 2021 mention that he "felt fine" and "d[id]n't need" his medication. *Id.* at 22. The ALJ discounted diabetes and hypothyroidism as severe impairments because "[t]he treatment record does not reflect ongoing symptoms related to these conditions since the application date." *Id.* The ALJ also referenced Plaintiff's comment (made while refusing dialysis and other treatment) "that he exercised daily and felt there was nothing wrong with him" in discounting all of these conditions. *Id.* The ALJ discounted sleep apnea as a severe impairment because Plaintiff "denied fatigue and daytime somnolence" at one appointment in September 2021 and later "reported that he exercised daily and believed nothing was wrong with him[.]" *Id.* at 23. Finally, the ALJ discounted Plaintiff's obesity as a severe impairment because "the treatment record does not identify any symptoms related to the claimant's body habitus[,]" Plaintiff "has not reported any ongoing fatigue since the application date[,]" and he exercised daily. *Id.* The ALJ does not appear to have addressed Plaintiff's alleged PTSD separately from Plaintiff's anxiety.

At Step 3, the ALJ concluded that none of Plaintiff's impairments, alone or in

11

combination, met or medically exceeded the severity of a listed impairment. AR at 23. The ALJ determined that Plaintiff did not satisfy the "Paragraph B" criteria for a mental impairment. *Id.* The Paragraph B criteria require one "extreme" or two "marked" limitations across four broad areas of functioning. In the first area of functioning (which is understanding, remembering, or applying information), the ALJ found that Plaintiff had at most a mild limitation because Plaintiff exhibited no "deficits with cognition or memory." In the second area of functioning (interacting with others), the ALJ assessed a moderate limitation because although treatment "[p]roviders did not identify social difficulties working with the claimant during medical visits[,]" Plaintiff "reported some paranoia and social withdrawal to providers" and "testified that he experiences anxiety around others." In the third area (concentrating, persisting, or maintaining pace), the ALJ assessed another moderate limitation because Plaintiff's auditory hallucinations "improved around September 2021 with medication and reduced substance use" and the record reflected no difficulties with concentration since then. *Id.* And in the fourth area (adapting or managing oneself), the ALJ assessed Plaintiff with a mild limitation because "[t]he record does not identify significant problems with personal care or activities of daily living. Providers did not identify ongoing problems emotional regulation [sic] during medical visits. The record confirms that the claimant is able to seek out appropriate medical care and attend appointments." *Id.* at 24. Accordingly, the ALJ found that the Paragraph B criteria were not satisfied. *Id.*

The ALJ determined that Plaintiff could "perform a full range of work at all exertional levels" with the following nonexertional limitations: only simple, routine tasks; only brief and superficial contact with coworkers and supervisors; no interactions with the public; only routine changes in a workplace setting; and no fast-paced or production-rate work. AR at 24. The ALJ found Plaintiff's symptom testimony "persuasive but only to the extent consistent with" the limitations the ALJ found. *Id.* at 27. After finding that Plaintiff had "at least a high school education[,] the ALJ determined that Plaintiff could work as a commercial cleaner (heavy labor), construction worker II (very heavy labor), or wall cleaner (medium labor). *Id.* at 27–28.

Plaintiff appeals.

### III.  Standard

The Social Security Act limits judicial review of the Commissioner's decisions to final

1  decisions made after a hearing.  42 U.S.C. § 405(g).  The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  *Id.*  A district court has limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error.  *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997).  "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  However, courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

**IV.     Analysis**

The court finds that the ALJ erred at Steps 2 and 3 of the analysis.

*a.  Step 2 Errors*

1. <u>Sleep Apnea</u>

At Step 2, the ALJ determined that Plaintiff's sleep apnea was non-severe based on a September 2021 denial of fatigue and daytime somnolence and a later assertion by Plaintiff that he exercised every day and felt fine.  In the context of the record as a whole, however, this is not substantial evidence supporting a non-severity finding.  The record reflects that Plaintiff was diagnosed with sleep apnea well before the alleged onset date, struggled to get enough sleep throughout the relevant time period, and was breathing so heavily in 2022 that a mental health provider felt the need to alert Plaintiff's physician, who in turn scheduled an urgent sleep study.

13

Plaintiff's symptoms appear to have abated somewhat in September of 2021, a month when he reported getting 7 to 8 hours of sleep per night. However, the record indicates that Plaintiff slept poorly before this and that his sleep began deteriorating shortly after this. Plaintiff's September 2021 sleep apnea symptoms, in other words, appear to be an anomaly in light of the record as a whole.

As for Plaintiff's general statement that he exercised daily and felt that nothing was wrong with him, this was not made in the context of sleep apnea, but rather as part of Plaintiff's refusal of treatment for other conditions. Further, this statement was equivocal, as Plaintiff referenced "whatever is wrong with him" in the same exchange. And Plaintiff does not appear to have been thinking rationally about his symptoms at the time he made the statement, as he claimed that his ailments had started in prison and would resolve upon his release, then offered this as a reason he did not need medication while in prison. Indeed, in the same exchange, he refused dialysis after being told that he could die without it. In short, it was a general and self-contradicted statement made at a time when a reasonable person would question the soundness of Plaintiff's thinking.

For these reasons, the ALJ's finding that Plaintiff's sleep apnea was non-severe is not supported by substantial evidence in light of the record as a whole.

### 2. Obesity

The ALJ found that Plaintiff's obesity was a non-severe impairment because "the treatment record does not identify any symptoms related to the claimant's body habitus[,]" Plaintiff "has not reported any ongoing fatigue since the application date[,]" and Plaintiff exercises daily. AR at 23. The first reason is not supported by the record, which reflects that Plaintiff's obesity is related to his bilateral lower extremity edema. As for the second reason, Plaintiff has suffered from fatigue at several points since the application date, although some of this may be related to his sleep apnea. Finally, an "impairment . . . may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (internal quotations omitted). The fact that Plaintiff is able to exercise for unspecified periods of time does not establish that Plaintiff's obesity and edema would have no more than a minimal effect on his ability to perform medium,

heavy, or very heavy labor for forty hours per week. Accordingly, substantial evidence does not support the ALJ's classification of Plaintiff's obesity as a non-severe impairment.

### 3. Harmlessness

The failure to find a disability severe at Step 2 is considered harmless if the non-severe disability is nonetheless taken into account at Steps 4 and 5. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). Here, however, the court cannot conclude that the omissions at Step 2 were harmless. There is no indication that the ALJ factored sleep apnea or obesity into the conclusions drawn at Steps 4 and 5. Indeed, the ALJ concluded that Plaintiff could perform work "at all exertional levels," a finding potentially incompatible with fatigue and edema. Further, the ALJ claimed that the treatment record "illustrates no severe physical impairments" and discredited Plaintiff's testimony about his physical symptoms on that basis. Because the Step 2 findings of non-severity as to Plaintiff's obesity and sleep apnea appear to have affected other parts of the ALJ's analysis, remand is required.

### b. *Step 3 Errors*

While the Step 2 errors are sufficient to warrant remand on their own, the court also discerns error in the ALJ's Step 3 analysis and will address it now for the sake of efficiency.

As discussed above, the ALJ assessed Plaintiff with a mild limitation in adapting and managing himself because "[t]he record does not identify significant problems with personal care or activities of daily living. Providers did not identify ongoing problems emotional regulation [sic] during medical visits. The record confirms that the claimant is able to seek out appropriate medical care and attend appointments." AR at 24. In fact, the record discloses a significant problem with Plaintiff's personal care and activities of daily living: his inability or refusal to seek medical treatment for himself. While Plaintiff did attend some appointments and take some of his prescribed medication, he would often avoid doing so for irrational reasons, sometimes even in the face of warnings that his life was at risk. While Plaintiff did not suffer from significant problems with emotional regulation when receiving medical care, the record is replete with instances of Plaintiff failing to regulate his emotions (such as anxiety and paranoia) in order to accept medical care in the first place. And while Plaintiff did seek out certain types of medical care on occasion,

15

this is not substantial evidence of a mostly-intact ability to adapt or manage himself in light of the many, many times Plaintiff refused such care.

In short, the court determines that it was error for the ALJ to find that Plaintiff had a merely "mild" limitation in adapting and managing himself. On remand, the ALJ is to reconsider all of Plaintiff's paragraph B limitations in light of the exhaustive record of Plaintiff's treatment refusal, as the court believes that Plaintiff's history bears on other areas of his functioning as well.

Accordingly, the Commissioner's decision is reversed and the case is remanded to the ALJ for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: February 13, 2025

ROBERT M. ILLMAN
United States Magistrate Judge